1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**
9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10

11  BRANDON NIXON,                              No.  2:24-CV-1531-KJM-DMC-P

12              Petitioner,

13      v.                                      <u>FINDINGS AND RECOMMENDATIONS</u>

14  RAUL MORALES,

15              Respondent.

16

17          Petitioner, who is proceeding pro se, brings this petition for a writ of habeas

18  corpus under 28 U.S.C. § 2254.  Pending before the Court are Petitioner's petition for a writ of

19  habeas corpus, ECF No. 1, Respondent's answer, ECF No. 14, and Petitioner's traverse, ECF No.

20  24.  Respondent has lodged the state court record, ECF No. 13.

21          Because this action was filed after April 26, 1996, the provisions of the

22  Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.

23  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Calderon v. United States Dist. Ct.</u> <u>(Beeler)</u>, 128

24  F.3d 1283, 1287 (9th Cir. 1997), <u>cert. denied,</u> 522 U.S. 1099 (1998).  Under AEDPA, federal

25  habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in

26  / / /

27  / / /

28  / / /

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at

2

1   406.  If a state court decision is "contrary to" clearly established law, it is reviewed to determine

2   first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040, 1052 n.6

3   (9th Cir. 2002).  If so, the next question is whether such error was structural, in which case federal

4   habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the

5   error had a substantial and injurious effect on the verdict, or was harmless.  See id.

6           State court decisions are reviewed under the far more deferential "unreasonable

7   application of" standard where it identifies the correct legal rule from Supreme Court cases, but

8   unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

9   510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

10  that federal habeas relief may be available under this standard where the state court either

11  unreasonably extends a legal principle to a new context where it should not apply, or

12  unreasonably refuses to extend that principle to a new context where it should apply.  See

13  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

14  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

15  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

16  75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even

17  where the federal habeas court concludes that the state court decision is clearly erroneous. See

18  Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

19  deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

20  As with state court decisions which are "contrary to" established federal law, where a state court

21  decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

22  unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

23          The "unreasonable application of" standard also applies where the state court

24  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

25  848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).   Such decisions

26  are considered adjudications on the merits and are, therefore, entitled to deference under the

27  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 982.

28  The federal habeas court assumes that state court applied the correct law and analyzes whether the

1   state court's summary denial was based on an objectively unreasonable application of that law.

2   See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

3

4                                   **I. BACKGROUND**

5   A.      **Facts**[1]

6              The California Court of Appeal, in reviewing Petitioner's conviction on direct

7   review, recited the following background and facts:

8              While the Facebook post at issue in this case was posted in July
9        2019, we begin our summary of the background facts with a different
         Facebook post, from about two years earlier. We do so because this earlier
         post, and defendant's subsequent conduct, informed how law enforcement
10       reacted to the July 2019 post.
11             In May 2017, defendant posted a picture of Cosumnes Oaks High
         School, accompanied by a diatribe about the school. Defendant began the
12       post by saying that he graduated from the school five years earlier and
         calling his time there "the worst nightmare that lasted four miserable years
         with lasting bitterness and regret that won't soon be left behind."
13       Defendant complained of "bullying" and "incompetent faculty," and then
         derided the School Resource Officer, Deputy Patrick Gallagher, calling
14       him "a skinhead lookin ass . . . pig." Defendant accused the school of
         "harbor[ing] terrorists" and accused Deputy Gallagher of being "the ring
15       leader." The post concluded: "I would NEVER shed a tear or mourn
         should the day come a tragic incident happens at the school. Rather I'd
16       commend anyone who would unleash their wrath on those school grounds,
         console and comfort their family members and provide any assistance
17       possible including helping them escape to a country that has no extradition
         agreement with the US."
18             Someone who saw defendant's Facebook post informed the
         Sacramento County Sheriff's Department. A detective searched through
19       defendant's public Facebook page and saw photos of him holding
         firearms. The detective and several other officers then went to defendant's
20       house. They initially observed the house from outside. When defendant
         left the house and drove away in his car, the officers conducted a traffic
21       stop. A search of the car uncovered a .40 caliber semi-automatic handgun
         in the glove compartment. A subsequent search of a storage locker
22       uncovered a shotgun.
23             Similar posts (tweets) were made by defendant on Twitter on the
         same day he made the Facebook post. Two days later, after sheriff's
24       deputies showed up at defendant's house, he sent the following six tweets:
         "Well that went very well yesterday"; "A lot of people got concerned";

25   _____

     [1]        Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made
26   by a State court shall be presumed to be correct." Findings of fact in the last reasoned state court
     decision are entitled to a presumption of correctness, rebuttable only by clear and convincing
27   evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). Petitioner bears the
     burden of rebutting this presumption by clear and convincing evidence. See id. These facts are,
28   therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be
     referred to as "defendant."

"Which is a great thing"; "Nothing better to be respected and feared at the same time"; "Damn it feels good to be a gangsta"; and "Patrick Gallagher is still a bitch tho." In a direct message exchange on Twitter the same day, defendant explained that "cops came to [his] house" because of "a post [he] made on Facebook" that included "harsh critical remarks about [his] high school and a sheriff deputy that used to work there." Defendant added: "I wished ill will against the school and people saw it because I deliberately made to where anyone can see it and someone saw my album I [s]tay [s]trapped 24/7/365 with my guns and thought they were tied together so at least six units responded to my house and if my mom wasn't there I would've grabbed my guns and who knows what would've happened."

Sometime in 2018, defendant pled no contest to three felony offenses and two misdemeanor offenses, including carrying a concealed weapon and carrying a loaded firearm, and was sentenced to a stipulated split sentence of five years and four months with the first four months to be served in custody and the remaining five years on mandatory supervision. (People v. Nixon (Sept. 30, 2022, C094767) [nonpub. opn.], rev. granted Dec. 28, 2022, S277219.)

In December 2018, after defendant was released on mandatory supervision, he was pulled over by Officer Scott. Defendant was handcuffed and searched during the traffic stop and then released without citation. According to Officer Scott, defendant was respectful and professional during this interaction, but did ask for his badge number. Defendant later filed a complaint against the officer.

Later that month, defendant went to the Elk Grove Police Department's headquarters and used his cell phone to record a video of the outside of the building. He did so from a public sidewalk. Officer Daniel Emerson was advised of defendant's presence and came outside. The officer asked defendant whether there was any reason he was filming the building. Defendant answered: "Cause I'm allowed to." Officer Emerson responded: "Sure, you are allowed to. Do you have any questions about the facility?" Defendant answered: "No, I do – I do have an issue with one of your officers, but I will take that with him personally." Defendant then provided Officer Scott's name and badge number and said he had already filed a complaint. Defendant added that there would "be some problems" if he saw Officer Scott again "[b]ecause it's personal." Officer Emerson then confirmed with defendant that he was on probation for "[g]un charges" and conducted a pat down search for weapons. After a short conversation about the department's process for handling complaints filed against officers, defendant said that if he saw Officer Scott again, he would "whoop his ass." Officer Emerson advised defendant that he was "already goin' through the appropriate steps" of filing a complaint against Officer Scott, but added, "probably what you shouldn't be doing is coming out to the police department and – and making threats against the officer if you see him again, okay?" Officer Emerson then told defendant he could continue videotaping, "it's a public place," but again warned defendant not to threaten any officers. Defendant said he understood, and the encounter ended amicably.

Not long after this incident, Officer Emerson called Officer Scott and asked him whether he knew someone named Brandon Nixon. Officer Scott said he did. Officer Emerson then said: "Well, he was just at . . . the police department saying he was going to whoop your ass and asking where you were." Around the same time, Detective Anthony Fox was asked to investigate defendant as a possible security risk. The detective

5

found defendant's Facebook page and looked at it periodically during the next several months.

On February 21, 2019, defendant was again using his cell phone to record a video on the sidewalk outside the police department headquarters. This time, defendant was contacted by a different officer, who asked whether he needed anything. Defendant said he did not, and the officer left.

On March 14, 2019, defendant returned to again record video outside the police department headquarters. A patrol supervisor monitored defendant's activity for a few minutes, but did not make contact because he "didn't feel that there was any need for confrontation with him."

On March 22, 2019, defendant was again recording video outside the building. The same officer who contacted him on February 21 again made contact with defendant and asked whether he needed anything. This time, the officer was aware that defendant was on probation for possession of weapons and conducted a probation search. After the search, the officer left defendant to his filming.

On April 9, 2019, defendant returned to record more video. This time he was contacted by Officers Daniel Coleman and four other officers. Officer Coleman was aware that defendant had been out there recording video on several prior occasions. He also knew defendant was on searchable probation. When the officers approached defendant, Officer Coleman asked: "Can we help you, Mr. Nixon?" Defendant answered: "Nope. You cannot." Officer Coleman then detained defendant and began conducting a probation search, prompting defendant to say: "Well, you know, now I'll be filing a police complaint against you guys." Defendant, Officer Coleman, and another officer, Officer Schmidt, then argued about the legality of the search and whether the police were harassing defendant or vice versa. The argument became more and more heated as it went on.

At the conclusion of the search, Officer Coleman told defendant not to grab for anything until instructed to do so. Defendant responded: "Fuck off." Officer Coleman told defendant that he would be going to jail for obstruction if he did not listen, to which defendant replied: "Obstruction my ass, bitch." Officer Coleman then told defendant to take his things and leave. Defendant responded: "It's public property dipshit." After Officer Coleman told defendant to leave three more times and told him he was causing a disturbance, defendant responded: "I can cause a disturbance, mother fucker. You haven't seen shit yet bitch." At this point, one of the officers said, apparently to the other officers: "Okay, let's go." Defendant continued: "Fuck you, fuckin' your wife, fuck your kids, fuck all you mother fuckers. I hope you all get killed in the line of duty bitch."

Defendant live streamed this encounter on his Facebook account. He also posted: "Fuck the bitch-ass Elk Grove PD. Ya'll mothafuckas done messed with the wrong [nword]. To those five pigs who harassed me today, just know, payback's a [n-word], and ya'll gonna get yours."

On July 19, 2019, defendant made the Facebook post that would form the basis of his criminal threats conviction. Defendant posted a picture of Officer Scott, Officer Schmidt, and a third officer. Crosshairs are superimposed over the faces of Officers Scott and Schmidt. The picture is accompanied by the words: "Fuck both of these bitch ass cops and the Elk Grove Police Department. I hope both of you scum bags are killed in the line of duty and your family members are BRUTALLY murdered."

/ / /

6

Detective Fox discovered this post four days later during a routine check of defendant's Facebook account and believed it was a direct threat against the lives of Officers Scott and Schmidt. He also discovered the live stream of the April 2019 encounter. The detective further found another post that included a picture of Officer Coleman and one of the other officers involved in that encounter. Crosshairs are superimposed over Officer Coleman's face. This post was accompanied by the words: "I don't give a fuck like Tupac. I get a fucking thrill when I see a cop drop."

Defendant's Facebook account was titled, "Ballistically Correct." The use of crosshairs over the faces of people defendant despised was a common motif of defendant's posts. We need not describe these other posts in any detail. It will suffice to note that they included two Sacramento County Superior Court judges and the former Sacramento County Sheriff.

The day after Detective Fox made these discoveries, officers contacted defendant at his home. He was detained and the house was searched. Additional images with crosshairs over various people's faces were found on defendant's computer. Internet searches on defendant's cell phone indicated he was seeking information regarding the legality of probation searches and the locations of ammunition checkpoints.

Officers also found an essay on defendant's phone titled, "Guns & Violence: An Addiction That Nearly Killed Me," chronicling defendant's childhood obsession with violent video games and claiming that "bullying and hazing" in high school caused him to make death threats "as a deterrent which only backfired." Defendant also explained that this bullying later caused him to buy guns and ammunition and make a "hit list of all the people [he] wanted to kill from school and the military." Defendant added: "I was even so hell bent on harming those who harmed me I purchased rifle ammunition and wrote the names of those individuals on the bullets that I had." The essay then describes the incident arising out of the 2017 Facebook post, ultimately resulting in "five convictions on [his] record" and subsequent difficulty finding employment. Defendant further noted that he had many dreams of murdering "people who had wronged [him] in the past . . . [b]lowing their heads off and brains out riddling their bodies with bullets," and that he used to believe that carrying a handgun was an "honorable and mandatory thing to be a gangsta." Defendant concluded the essay by explaining that "all [he] can do is learn from these mistakes" and share his story with others "so they can understand that guns and violence are both debilitating addictions that have real life consequences."

Officers further searched defendant's Instagram account and found a conversation from July 8, 2019, a week and a half before he made the Facebook post at issue in this case, in which defendant told another Instagram user that he had "posted a threat against police." This comment appears to be referring to an earlier version of the Facebook post, dated June 27, 2019, which stated: "Fuck the bitch-ass, hashtag, Elk Grove Police Department and Patrick Scott, badge 261, left, and the cop I haven't been able to identify yet in the middle."

On July 31, 2019, a week after defendant's home was searched, Detective Fox showed Officer Scott the Facebook post. Officer Scott "took [the post] to mean that [defendant] wanted to kill [him] and Officer Schmidt and that he hopes our family members are murdered." Officer Scott took the post to be a serious threat because: (1) he knew defendant had come to the police department on a prior occasion and said he wanted to "whoop my ass," (2) he knew defendant was on probation for a firearm-

related offense, (3) he was also told that a sheriff's deputy had contacted the police department and said defendant "threatened the . . . deputy in the past, and to take him seriously," and (4) he further knew that deputy was investigating "something about threats about shooting up Cosumnes Oaks High School." All of this caused Officer Scott to experience sustained fear for his life.

ECF No. 13-27, pgs. 3-9.

B.    **Procedural History**

The Court of Appeal recited the following relevant state court procedural history leading to direct review:

A jury convicted defendant Brandon Andre Keith Nixon of making a criminal threat against the life of Officer Patrick Scott of the Elk Grove Police Department. The threat itself was conveyed in a Facebook post that included a photograph of Officer Scott and another officer with crosshairs over their faces. [footnote omitted]. The photograph was accompanied by the words: "Fuck both of these bitch ass cops and the Elk Grove Police Department. I hope both of you scum bags are killed in the line of duty and your family members are BRUTALLY murdered." Based on this post, as well as the surrounding circumstances, and additional evidence relevant to defendant's intent, the jury concluded the elements of [California] Penal Code section 422 were satisfied. [footnote omitted]. Defendant was sentenced to the upper term sentence of three years in state prison for this crime.

ECF No. 13-27, pgs. 1-2.

The California Court of Appeal issued an unpublished decision affirming Petitioner's conviction. See ECF No. 13-27.  On June 21, 2023, the California Supreme Court denied Petitioner's petition for direct review without comment or citation. See ECF No. 13-29. Petitioner did not file any state court post-conviction actions.

## II. DISCUSSION

In the habeas petition, which incorporates as an attached document Petitioner's petition for review filed in the California Supreme Court, Petitioner asserts the following claims for relief: (1) the evidence was insufficient to show that Petitioner's post constituted a true threat intended to be "transmitted to the alleged victim;" (2) the trial court erred in admitting evidence of past threats made by Petitioner; (3) the trial court erred by failing to instruct the jury on causation; and (4) the cumulative effect of these errors was prejudicial. See ECF No. 1, pgs. 17-

8

1   18.  For the reasons discussed below, the Court finds that federal habeas relief is not warranted.

2           A.      **Sufficiency of the Evidence**

3           When a challenge is brought alleging insufficient evidence, federal habeas corpus

4   relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the

5   light most favorable to the prosecution, no rational trier of fact could have found proof of guilt

6   beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[2]  Under

7   Jackson, the Court must review the entire record when the sufficiency of the evidence is

8   challenged on habeas.  See id.  It is the province of the jury to "resolve conflicts in the

9   testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

10  facts."  Id.  "The question is not whether we are personally convinced beyond a reasonable

11  doubt.  It is whether rational jurors could reach the conclusion that these jurors reached."

12  Roehler v. Borg, 945 F.2d

13  303, 306 (9th Cir. 1991); see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  The federal

14  habeas court determines sufficiency of the evidence in the context of the substantive elements of

15  the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n.16.

16          In addressing Petitioner's claim regarding the sufficiency of the evidence, the

17  California Court of Appeal first outlined the applicable legal standards for the claim, as follows

18              "'To determine the sufficiency of the evidence to support a
19          conviction, an appellate court reviews the entire record in the light most
            favorable to the prosecution to determine whether it contains evidence that
            is reasonable, credible, and of solid value, from which a rational trier of
20          fact could find the defendant guilty beyond a reasonable doubt.'
            [Citations.]" (People v. Wallace (2008) 44 Cal.4th 1032, 1077; Jackson v.
21          Virginia (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].) The
            standard of review is the same in cases in which the prosecution relies on
22          circumstantial evidence. (People v. Snow (2003) 30 Cal.4th 43, 66.)
            "'Although it is the duty of the jury to acquit a defendant if it finds that
23          circumstantial evidence is susceptible of two interpretations, one of which

24  _____

25      [2]     Even though Jackson was decided before AEDPA's effective date, this expression
    of the law is valid under AEDPA's standard of federal habeas corpus review.  A state court
26  decision denying relief in the face of a record establishing that no rational jury could have found
    proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable
27  application of the law as outlined in Jackson.  Cf. Bruce v. Terhune, 376 F.3d 950, 959 (9th Cir.
    2004) (denying habeas relief on sufficiency of the evidence claim under AEDPA standard of
28  review because a rational jury could make the finding at issue).

suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.'" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

ECF No. 13-27, pgs. 9-10.

By citing to and analyzing the facts of the case consistent with the standard outlined in Jackson v. Virginia for a claim of insufficient evidence, the California Court of Appeal applied clearly establishes Supreme Court precedent. This Court, therefor, will review to determine whether the state court's application of clearly established law to the facts was unreasonable.

Applying Jackson v. Virginia, The California Court of Appeal outlined the elements under state law for the offense of making criminal threats as follows:

In order to prove the offense of making criminal threats under section 422, "[t]he prosecution must prove '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat — which may be "made verbally, in writing, or by means of an electronic communication device" — was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' [Citations.]" (*In re George T.* (2004) 33 Cal.4th 620, 630 (*George T.*).)

ECF No. 13-27, pg. 10.

In the context of the elements of the crime under state law, Petitioner argues here, as he did in the state courts, as follows: (1) the evidence was insufficient to establish the required specific intent; and (2) the evidence was insufficient to establish that the Facebook post was a true threat. See ECF No. 1, pg. 17.

/ / /

/ / /

/ / /

1    / / /

2           1.    <u>Specific Intent</u>

3           Turning to the specific elements of the offense and the sufficiency of the

4    evidence to satisfy those elements, the Court of Appeal first discussed Petitioner's intent for

5    Officer Scott to View the Facebook post at issue:

6           As we explained in *Ryan D., supra*, 100 Cal.App.4th 854, although
     section 422 "does not require that a threat be personally communicated to

7    the victim by the person who makes the threat," the statute "'targets only
     those who try to instill fear in others.' [Citation.] In other words, section

8    422 does not punish such things as 'mere angry utterances or ranting
     soliloquies, however violent.' [Citation.] Accordingly, where the

9    accused did not personally communicate a threat to the victim, it must be
     shown that he specifically intended that the threat be conveyed to the

10   victim." (*Ryan D*., at p. 861.)
            Here, the evidence is more than sufficient to satisfy this

11   requirement.  First, defendant's Facebook account was public, which
     means that anyone could go to his page and see the post in question. That

12   defendant knew this to be the case is evidenced by the fact that when he
     made the May 2017 post about Cosumnes Oaks High School and Deputy

13   Gallagher, someone saw the post and informed the sheriff's department,
     and sheriff's deputies thereafter stopped defendant and searched him and

14   his house. Two days later, in a message exchange on Twitter, defendant
     admitted the deputies did so because he "deliberately made to where

15   anyone can see" his Facebook posts. He also surmised that their level of
     concern was heightened because, as he put it, "I [s]tay [s]trapped 24/7/365

16   with my guns," and photos of him carrying those guns were also
     prominently displayed on his Facebook page. Thus, defendant's own

17   comments establish he knew law enforcement could view his Facebook
     page. [4]

18
            [4] Morin testified that she received the call detail records

19   and cell phone extractions from Detective Hitchcock.
     However, Hitchcock would have received the call detail

20   records from cell phone carriers. This will become
     important later.

21
            Second, after defendant was pulled over by Officer Scott in

22   December 2018, he went to the Elk Grove Police Department headquarters
     and told Officer Emerson that he had a "personal" problem with Officer

23   Scott, and if he ever saw him again, he would "whoop his ass." Defendant
     also admitted to Officer Emerson during the interaction that he was on

24   probation for gun-related offenses. Although there is no evidence that
     defendant knew Officer Emerson conveyed defendant's message to

25   Officer Scott, this interaction at the police station gave law enforcement
     reason to periodically monitor defendant's Facebook account. Based on

26   defendant's previous experience after making the Cosumnes Oaks High
     School post, a jury could have reasonably concluded defendant would

27   have known the Elk Grove Police Department was now part of his
     Facebook audience.

28

          11

/ / /

    Third, defendant returned to the police station at least four more times in the next four months in what can best be described as a campaign of seeking out conflict with the police. The last of these interactions, in April 2019, between defendant and police officers became quite heated, culminating in defendant saying: "Fuck you, fuckin' your wife, fuck your kids, fuck all you mother fuckers. I hope you all get killed in the line of duty." We need not determine whether this is a criminal threat. We do note, however, that even if the police were not already monitoring defendant's Facebook page, each of these interactions gave police more of a reason to do so. Defendant would have known this as well. Indeed, his engagement in these activities strongly suggests that he not only intended to place himself on law enforcement's radar but was going out of his way to hold their attention and highlight himself as an ongoing potential danger to the department and its officers.

    Finally, the Facebook post forming the basis for defendant's criminal threats conviction was posted in July 2019. It depicted both Officer Scott and Officer Schmidt, who was involved in the April 2019 interaction at the police station. Both officers had crosshairs superimposed over their faces, along with the words: "Fuck both of these bitch ass cops and the Elk Grove Police Department. I hope both of you scum bags are killed in the line of duty and your family members are BRUTALLY murdered." We discuss the status of this post as a criminal threat and not protected speech in the next section of this opinion. For now, we conclude, based on defendant's full engagement in conflict with the police, his previous experience with law enforcement monitoring his Facebook page, his status as a probationer on mandatory supervision following two felony gun-related offenses, his threat to assault Officer Scott during his initial appearance at the police station, and the escalating nature of his subsequent appearances at the police station, that the evidence strongly supports the conclusion that defendant knew law enforcement was likely to be monitoring his Facebook page when he posted the content at issue in this case. From this follows a reasonable inference that defendant intended the post to be viewed by Officers Scott and Schmidt.

    ECF No. 13-27, pgs. 12-14.

    The Court finds that the state court's determination regarding intent was not based on an unreasonable application of <u>Jackson v. Virginia</u> to the facts of this case. Specifically, as the Court of Appeal noted, there was significant evidence showing intent, including: (1) Petitioner's Facebook account, on which the post as issue was made, was public and Petitioner knew from prior experience that his Facebook account could be viewed by the Elk Grove Police Department; (2) based on Petitioner's interactions with the Elk Grove Police Department after he was pulled over in 2018 by Officer Scott, a jury could reasonably have determined that the Elk Grove Police Department was now part of Petitioner's Facebook audience; and (3) a jury could have reasonably found that Petitioner's interactions with the Elk Grove Police Department in the

1 months following being pulled over gave police even more reason to monitor Petitioner's

2 Facebook posts.

3          2.    <u>True Threat</u>

4          As to whether Petitioner's Facebook post constituted a true threat as opposed to

5 protected speech under the First Amendment, the Court of Appeal stated as follows:

> "The language of . . . section 422 requires the threat to be 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat . . . .' (Italics added.) The statute punishes those threats which convey to the victim a gravity of purpose and an immediate prospect of execution. The use of the word 'so' indicates that unequivocality, unconditionality, immediacy, and specificity are not absolutely mandated but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim. The four qualities are simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim." (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1157-1158.)

> * * *

> We begin by acknowledging that were we to view the Facebook post in isolation, we might agree with defendant's position. It depicted officers Scott and Schmidt with crosshairs superimposed over their faces, along with the words: "Fuck both of these bitch ass cops and the Elk Grove Police Department. I hope both of you scum bags are killed in the line of duty and your family members are BRUTALLY murdered." Standing alone, the crosshairs imagery is ambiguous. Detective Fox testified that he interpreted it to mean that defendant was the one viewing these officers through the scope of a rifle, "aiming at" and "trying to shoot" them. Officer Scott viewed the crosshairs similarly. While we certainly agree the crosshair imagery unambiguously conveys defendant's wish for these officers to be targets of violence, it does not necessarily mean that he was personally threatening to shoot them. Indeed, it is at least arguable that defendant's intent with respect to use of the crosshairs is significantly clarified by the accompanying words. Defendant said he hoped Officers Scott and Schmidt would be killed in the line of duty and their family members brutally murdered, not that he would be the one to do so. But we do not view the Facebook post in isolation. (*See People v. Martinez* (1997) 53 Cal.App.4th 1212, 1218 ["the meaning of the threat . . . must be gleaned from the words and all of the surrounding circumstances"].)

> * * *

> . . .[H]ere, while the Facebook post is somewhat ambiguous on its face, viewed in light of the surrounding circumstances, it is sufficiently unequivocal, unconditional, immediate, and specific to have conveyed to Officer Scott a gravity of purpose and an immediate prospect of execution. Defendant used the same crosshairs imagery, placing them over the faces

13

of Officers Scott and Schmidt, and the accompanying words clarified he wanted both men targeted for violence, and for them and their families, to die. Defendant himself, apparently referring to an earlier version of this post, specifically called it "a threat against police." However, even if defendant was talking about a different post, this comment at the very least admits a general intent to threaten the police. And as we have already explained, defendant must have known that law enforcement would almost certainly be monitoring his Facebook page at the time he made the post, and a reasonable inference follows that he intended for the officers to view the post. Statements he made following the earlier Cosumnes Oaks High School post also support a reasonable inference that defendant not only intended them to view it, but also wanted to instill fear in them. With respect to Officer Scott specifically, several months before making the post, defendant came to the police station and threatened to physically assault the officer. Defendant was on mandatory supervision at the time, following two felony convictions for firearm offenses. Defendant then returned to the police station several times during the intervening months, seeking out conflict with officers. The last of these visits ended with threatening remarks made by defendant to the officers who detained him and performed a probation search, including Officer Schmidt. The Facebook post was made three months after this incident, and about seven months after defendant threatened to physically assault Officer Scott. Thus, . . . this is not a situation in which defendant made an angry and excited utterance immediately after a provoking event. Defendant's post was a calculated statement, made months later. While not absolutely unequivocal, unconditional, immediate, and specific, it was sufficiently so to qualify as a true threat.

* * *

We conclude defendant's criminal threats conviction is supported by substantial evidence and does not amount to an infringement of defendant's First Amendment right to free speech.

ECF No. 13-27, pgs. 17-20.

As with intent, this Court also finds that the Court of Appeal's determination regarding whether the Facebook post constituted a true threat was not based on an unreasonable application of the facts to <u>Jackson v. Virginia</u>. Specifically, as the Court of Appeal observed, the evidence was sufficient to allow a jury to determine that Petitioner's Facebook post threatening the police officers was sufficiently unequivocal, unconditional, immediate, and specific. The evidence shows that post was unequivocal in that Petitioner wanted both officers to be brutally murdered. For the same reason, the evidence shows that the post was unconditional, and immediate. Finally, the evidence shows that the post was directed specifically at Officers Scott and Schmidt. Taken together, a rational jury could have reasonably found each of the factors showing a true threat had been met.

14

1    ///

2    **B.    Claims Based on State Law**

3    Petitioner asserts two claims based on errors of state law.  First, Petitioner argues

4    that the trial court erred in admitting evidence of prior threats.  See ECF No. 1, pg. 17.  Second,

5    Petitioner contends that the trial court erred in failing to instruct the jury regarding causation.  See

6    id.

7    A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a

8    transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083,

9    1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available

10    for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see

11    also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378,

12    1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  See Milton v.

13    Wainwright, 407 U.S. 371, 377 (1972).

14    However, a "claim of error based upon a right not specifically guaranteed by the

15    Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

16    infects the entire trial that the resulting conviction violates the defendant's right to due process."

17    Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

18    Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  Because federal habeas

19    relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal

20    habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due

21    process.  See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d

22    971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also

23    Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).   To raise such a claim in a federal

24    habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of

25    justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95

26    (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).   In any event, an

27    evidentiary error is considered harmless if it did not have a substantial and injurious effect in

28    determining the jury's verdict.  See Padilla v. Terhune, 309 F.3d 614, 621 (9th Cir. 2002); see

15

1    also Laboa v. Calderon, 224 F.3d 972, 976 (9th Cir. 2001).

2            A challenge to jury instructions also does not generally give rise to a federal

3    constitutional claim.  See Middleton, 768 F.2d at 1085) (citing Engle v. Isaac, 456 U.S. 107, 119

4    (1982)).  However, even if there is constitutional error, non-structural errors may be harmless.

5    See Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California,

6    386 U.S. 18 (1967)).  In the context of jury instructions, an error is not structural so long as the

7    error does not "vitiat[e] all the jury's findings."  Sullivan v. Louisiana, 508 U.S. 275, 2781 (1993)

8    (holding that an erroneous reasonable doubt instruction resulted in structural error not subject to

9    harmless error analysis).  An instructional error which resulted in omission of an element of the

10   offense was a trial error subject to harmless error review.  See Hedgpeth, 129 S.Ct. at 532 (citing

11   Neder v. United States, 527 U.S. 1 (1999)).  An erroneous aider and abettor instruction is also not

12   structural.  See id. (citing California v. Roy, 519 U.S. 2 (1996) (per curiam)).  A jury instruction

13   which misstates an element of an offense is also not structural.  See id. (citing Pope v. Illinois,

14   481 U.S. 497 (1987)).  An erroneous burden-shifting instruction is also not structural.  See id.

15   (citing Rose v. Clark, 478 U.S. 570 (1986)).  Finally, an instruction on multiple theories of guilt

16   where one of the theories is improper does not result in a structural error requiring automatic

17   reversal but is error subject to harmless error analysis.  See id.

18           In Chapman, a case before the Supreme Court on direct review, the Court held that

19   "before a [non-structural] constitutional error can be held harmless, the court must be able to

20   declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  A different

21   harmless error standard applies to cases on collateral review.  In Brecht v. Abrahamson, the Court

22   stated that applying the Chapman standard on collateral review "undermines the States' interest in

23   finality and infringes upon their sovereignty over criminal matters."  507 U.S. 619, 637.  The

24   Court also noted that the Chapman standard is at odds with the historic meaning of habeas corpus

25   – which is meant to afford relief only to those who have been grievously wronged – because it

26   would require relief where there is only a reasonable possibility that a constitutional error

27   contributed to the verdict.  See id.  Therefore, in habeas cases, the standard applied in Kotteakos

28   v. United States, 328 U.S. 750 (1946), governs harmless error analysis for non-structural

16

1  constitutional errors.  See Brecht, 507 U.S. at 637.  Under this standard, as with claims of

2  evidentiary error, for jury instructions relief is available where non-structural error occurs only

3  where such error "had a substantial and injurious effect or influence in determining the jury's

4  verdict."  Kotteakos, 328 U.S. at 776.

5                  1.    Admission of Evidence of Prior Threats

6         In addressing Petitioner's claim, the Court of Appeal first provided additional

7  background, as follows:

> 8 Over defendant's objection, the trial court admitted testimony from
> F.L., who was defendant's squad leader in the Army Reserve in 2013. She
> 9 testified that defendant told her that he wanted to commit a shooting at his
> high school. F.L. warned him about making these statements, but he
> 10 continued to do so, causing her to report him to her immediate superior
> officer, who in turn reported the statements to the platoon sergeant.
> 11 Sometime later, defendant started sending F.L. text messages threatening
> to kill her and her family. She received 30 or 40 such messages, many of
> 12 which stated that defendant wanted to shoot her. One of these messages
> was received while F.L. was on her college campus. It also described what
> 13 she was wearing that day, causing F.L. to become more alarmed and
> report the threats to her superior officers. They took the threats seriously
> 14 enough to keep defendant and F.L. separated during gun training.
> The trial court admitted this testimony under Evidence Code
> 15 section 1101, subdivision (b), explaining that it was relevant to prove
> defendant's intent to threaten Officer Scott. The trial court also concluded
> 16 the probative value of this evidence was not substantially outweighed by
> any of the statutory counterweights found in Evidence Code section 352.
> 17
> ECF No. 13-27, pg. 21.
> 18

19         The Court of Appeal then stated that, under California law, "evidence of a

20  person's character or a trait of his or her character . . . is inadmissible when offered to prove his

21  or her conduct on a specified occasion."  See id. at 21-22.  However, the Court of Appeal further

22  stated that the "admission of evidence that a person committed a crime, civil wrong, or other acts

23  when relevant to prove some fact (such as . . . intent. . . ) other than his or her disposition to

24  commit such an act" is not prohibited.  Id.

25         The Court of Appeal continued as follows in determining that the trial court did

26  not err:

> 27 As stated previously, the crime of making a criminal threat
> requires proof that the person making the threat had "the specific intent
> 28 that the statement . . . is to be taken as a threat, even if there is no intent of

actually carrying it out. . . ." (§ 422, subd. (a).) The prior threats defendant made against F.L.'s life, and the lives of her family members, were relevant to prove he possessed a similar intent when he made the Facebook post at issue in this case. Indeed, "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402; see, *People v. Orloff* (2016) 2 Cal.App.5th 947, 956-957 [prior uncharged threats against other persons properly admitted as probative of whether the defendant had the requisite intent in making the charged threats].)

Defendant does not argue otherwise. Instead, he claims it "had little relevance" and "was simply not very probative," and therefore should have been excluded under Evidence Code section 352. This section provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) This provision "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," but also "requires that the danger of these evils substantially outweigh the probative value of the evidence." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; *People v. Tran* (2011) 51 Cal.4th 1040, 1047.) "Trial courts enjoy '"broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Holford* (2012) 203 Cal.App.4th 155, 167- 168 (*Holford*).)

We conclude there was no abuse of discretion. Contrary to defendant's argument on appeal, the challenged evidence was not "cumulative to the other evidence that the prosecution used to prove the same issue." As the trial court explained, referring to all of the evidence admitted proving defendant made a criminal threat, "it might appear to be cumulative on its face, but it's actually not. When you look at it, it's a stream of conduct over a relatively short period of time in succession, excepting [F.L.], one after the next, after the next. What it actually does is it's not as much cumulative as it's simply linear, telling the story from the People's view of what happened. . . ." We agree with this assessment. The prior threats made against F.L. and her family was not cumulative of the other evidence admitted against defendant in this case. That other evidence served to place defendant's Facebook post in its proper context. The evidence of the prior threats made against F.L. and her family was outside of that linear succession but was nevertheless highly probative of defendant's intent to threaten Officer Scott.

Nor was the probative value of these prior threats significantly diminished by the passage of time. They occurred in 2013, about six years before defendant made the Facebook post threatening Officer Scott. This is not remote conduct. (See *People v. Gutierrez* (1993) 14 Cal.App.4th 1425, 1435.) Moreover, in the meantime, defendant continued making threatening comments to and about people with whom he had issues. The question of remoteness for purposes of Evidence Code sections 352 and 1101, subdivision (b) is "whether the prior conduct is so old that it is not reasonable to conclude it speaks to a person's current mental state." (*People v. Williams* (2018) 23 Cal.App.5th 396, 422, fn. 9.) Defendant's

18

intervening conduct bolsters the conclusion that defendant likely harbored the same intent when he threatened F.L. and her family as he did when he made the Facebook post in this case.

Thus, while undeniably damaging to defendant's prospect of acquittal, the challenged evidence was highly probative of defendant's intent to threaten Officer Scott and his family. (*People v. Orloff*, supra, 2 Cal.App.5th at pp. 956-957.) "This court has noted that '"[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " [Citations.]' [Citation.]" (*Holford, supra*, 203 Cal.App.4th at p. 167.) The trial court did not abuse its discretion in concluding the probative value of the challenged evidence was not substantially outweighed by the danger of undue prejudice.

* * *

Finally, "[h]aving concluded that the trial court did not abuse its discretion under [Evidence Code] section 352, we must also reject defendant's argument that he was deprived of his constitutional right to a fair trial. '"The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair."' [Citation.]" (*Holford, supra*, 203 Cal.App.4th at p. 180.) The challenged evidence does not come close to this level of prejudice.

ECF No. 13-27, pgs. 22-24.

At the outset, the Court agrees with Respondent that there is no clearly established Supreme Court authority regarding whether state law violates due process by allowing admission of evidence of prior bad acts to show propensity to commit a charged crime.  See Alberni v. McDaniel, 458 F.3d 860, 863-64 (9th Cir. 2006) (citing Estelle v. McGuire, 502 U.S. 62 (1991)). Thus, the question is whether admission of evidence of prior threats made by Petitioner violated Petitioner's due process rights by creating a complete miscarriage of justice.  The Supreme Court has answered this question in the negative where prior bad act evidence is admitted to prove intent.  See Estelle, 502 U.S. 62 (1991).  Moreover, any error is harmless because, as discussed above, the evidence was sufficient in the absence of evidence of prior threats to allow the jury to find that Petitioner's Facebook post constituted a criminal threat.  Thus, admission of prior bad act evidence in this case did not have a substantial and injurious effect in determining the jury's

1    verdict.

2         For these reasons, the Court finds that the state court's denial of Petitioner's claim

3    of evidentiary error is not contrary to nor based on an unreasonable application of clearly

4    established law to the facts of this case.

5         2.    Jury Instructions

6         The Court of Appeal rejected Petitioner's claim that the trial court erred in failing

7    to instruct the jury on causation, stating as follows:

8         Defendant further asserts the trial court prejudicially erred and also
      violated his constitutional rights by failing to instruct the jury with
9      CALCRIM No. 240 on causation. He is mistaken.
           As stated previously, the crime of making a criminal threat
10     requires proof that the threat "causes [the recipient] reasonably to be in
      sustained fear for his or her own safety or for his or her immediate
11     family's safety. . . ." (§ 422, subd. (a).) However, a trial court has a duty to
      instruct on causation only when causation is at issue. (*People v. Bell*
12     (2020) 48 Cal.App.5th 1, 17; *People v. Bernhardt* (1963) 222 Cal.App.2d
      567, 591.)
13         Defendant argues, "[t]here was considerable controversy about
      what caused [Officer] Scott's fear," citing the officer's testimony
14     concerning what he knew and believed about defendant and his conduct
      prior to making the Facebook post. According to defendant, because there
15     was more than one cause of Officer Scott's fear, the trial court had a sua
      sponte duty to instruct the jury that the Facebook post itself must have
16     been "a substantial factor in causing" the officer's fear, as opposed to "a
      trivial or remote factor." (CALCRIM No. 240.) In response, the Attorney
17     General argues, "the defense theory presented at trial was that the
      Facebook post did not cause Officer Scott to be in fear, that is, [the
18     officer] was not in fear at all, not that there were other causes of [the
      officer's] fear." Thus, according to the Attorney General, "there was no
19     controversy presented concerning other possible causes of [Officer]
      Scott's fear," and therefore, the trial court had no sua sponte duty to
20     provide CALCRIM No. 240. The Attorney General has the better
      argument.
21         In any event, even assuming the trial court erred in failing to
      instruct the jury with CALCRIM No. 240, any assumed error would be
22     manifestly harmless under any standard of prejudice. Employing the most
      stringent standard, we conclude beyond a reasonable doubt that the failure
23     to provide CALCRIM No. 240 did not contribute to the verdict. (See
      *People v. Flood* (1998) 18 Cal.4th 470, 504.) First, the jury was instructed
24     that causation was required, specifically that the threat had to cause
      sustained fear. The alleged threat was the Facebook post. Second,
25     defendant does not take issue with the jury's conclusion that Officer Scott
      was placed in such fear, but rather complains that the jury should have
26     been further instructed that the Facebook post had to be a substantial
      factor in bringing about the fear, rather than a trivial or remote factor.
27     However, the other claimed "causes" of Officer Scott's fear were things
      the officer was told about defendant, such as the fact that he made the
28     2017 Cosumnes Oaks High School Facebook post, was on probation for

                                    20

gun charges, and threatened to assault him the first time he came to the police station. The jury was entitled to take these surrounding circumstances into consideration in determining whether the Facebook post placed Officer Scott in sustained fear. To be sure, some of what the officer believed about defendant was not entirely accurate, for example, his testimony suggested that he believed defendant threatened to carry out a school shooting, when the actual Cosumnes Oaks High School Facebook post did not go that far. But the claimed instructional error did not somehow prevent the jury from being able to assess what was true and what was not. Nor is it dispositive that Officer Scott testified that the Facebook post *alone* would have caused him "a little bit of fear." Again, the jury was not required to determine whether the Facebook post would have been sufficient, in isolation, to place Officer Scott in sustained fear. The jury was entitled to take the surrounding circumstances into account. CALCRIM No. 240 would not have informed the jury otherwise.

For all of these reasons, any assumed instructional error was harmless beyond a reasonable doubt.

ECF No. 13-27, pgs. 25-26.

This Court agrees with the California Court of Appeal that the Attorney General had the more persuasive argument under state law as to when a causation instruction under CALCRIM No. 240 is required. Specifically, as the Attorney General noted on direct appeal, CALCRIM No. 240 is required only when there is some dispute as to causation. Here, there was no dispute. Petitioner's theory was that the Facebook post did <u>not</u> cause any fear at all, not that there were potentially other causes of the officers' fear. Thus, there was no controversy as to various causes of the officers' fear.

Even if there was instructional error, this Court finds any error to be harmless applying the standard for cases on collateral review set forth in <u>Kotteakos v. United States</u> – i.e., whether the error had a substantial and injurious effect on the verdict. Instructional error regarding CALCRIM No. 240, if any occurred, did not have such an effect. As the Court of Appeal determined when applying the more rigid <u>Chapman</u> standard for cases on direct review, the jury was presented with sufficient evidence to allow it to determine, based on the totality of circumstances, that the Facebook post was a threat which caused the officers to be in fear. Notably, Officer Scott testified that the Facebook post caused him to be in fear, and the jury was entitled to accept this testimony.

For these reasons, the Court concludes that the state court's determination regarding a jury instruction on causation under CALCRIM No. 240 was neither contrary to nor

21

1    based on an unreasonable application of clearly established law.

2         **C.    <u>Cumulative Error</u>**

3              Petitioner argues here, as he did in the state courts, that the cumulative prejudicial

4    effect of the specific alleged errors resulted in a violation of his constitutional rights.  <u>See</u> ECF

5    No. 1, pg. 17.  The Court of Appeal rejected this claim, stating: "Having found no error,

6    prejudicial or otherwise, we must also reject defendant's assertion of cumulative prejudice."  <u>See</u>

7    ECF No. 13-27, pg. 26.

8              This Court agrees with Respondent that federal habeas relief is not available

9    because there is no clearly established rule of law announced by the United States Supreme Court

10   regarding cumulative error.  Though the Supreme Court concluded in <u>Chambers v. Mississippi</u>

11   that two constitutional evidentiary errors in combination were sufficiently prejudicial to deny a

12   complete defense, the Court specifically stated that the case was particularly fact-intensive and

13   that the holding "establish[ed] no new principles of constitutional law."  410 U.S. 284, 302

14   (1973).  In later cases, the Supreme Court clarified that <u>Chambers</u> is limited to the facts of that

15   case.  <u>See</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 53 (1996); <u>Michigan v. Bryant</u>, 562 U.S. 344, 370 n.

16   13 (2011).

17             Most circuit courts also hold that there is no clearly established stand-alone claim

18   of cumulative error cognizable in federal habeas cases.  <u>See e.g.</u> <u>Williams v. Anderson</u>, 460 F.3d

19   789 (6th Cir. 2006); <u>Wainright v. Lockhart</u>, 80 F.3d 1226, 1233 (8th Cir. 1996).   In <u>Parle v.</u>

20   <u>Runnels</u>, the Ninth Circuit held to the contrary and determined that cumulative error claims have

21   been clearly established by the Supreme Court.  <u>See</u> 505 F.3d 922 (9th Cir. 2007).  In doing so,

22   the Ninth Circuit relied on an extension of <u>Chambers</u>.  The Supreme Court, however, has since

23   repeatedly admonished that circuit court precedents do not constitute clearly established law for

24   purposes of federal habeas review under AEDPA.  <u>See e.g.</u> <u>Lopez v. Smith</u>, 574 U.S. 1, 6 (2014)

25   (Supreme Court cautions "the Ninth Circuit in particular"); <u>Glebe v. Frost</u>, 574 U.S. 21, 24 (2014)

26   (per curiam); <u>Marshall v. Rodgers</u>, 569 U.S. 58, 64 (2013); <u>Parker v. Matthews</u>, 567 U.S. 37, 48-

27   49 (2012) (per curiam).

28   / / /

1    ///

2          In any event, even if this Court were to extend <u>Chambers</u> as the Ninth Circuit did

3    in <u>Parle</u>, the Court finds that there is no cumulative error.  <u>Chambers</u> involved two separate

4    evidentiary errors which were determined to each be constitutional in magnitude when considered

5    separately as well as when considered cumulatively.  In essence, the case involved the situation

6    where two evidentiary rulings combined to result in a miscarriage of justice.  Here, in contrast,

7    the Court finds that none of Plaintiff's claims establishes constitutional error which cannot be

8    considered harmless.  Thus, the situation in <u>Chambers</u> is distinguishable from the instant matter,

9    in that here there are no separate constitutional errors which combined to result in a miscarriage

10   of justice in Petitioner's trial.

11

12                         **III.  CONCLUSION**

13          Based on the foregoing, the undersigned recommends that Petitioner's petition for

14   a writ of habeas corpus, ECF No. 1, be denied.

15          These findings and recommendations are submitted to the United States District

16   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

17   after being served with these findings and recommendations, any party may file written objections

18   with the court.  Responses to objections shall be filed within 14 days after service of objections.

19   Failure to file objections within the specified time may waive the right to appeal.  <u>See</u> <u>Martinez v.</u>

20   <u>Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

21

22   Dated:  July 29, 2025

23                                    _____
                                        DENNIS M. COTA
24                                    UNITED STATES MAGISTRATE JUDGE

25

26

27

28
                                        23